Meriel L. Darzen, Oregon State Bar (OSB) No. 113645
Email:  meriel@crag.org
Ralph Bloemers, OSB No. 984172
Email:  ralph@crag.org
Crag Law Center
3141 E Burnside Street
Portland, Oregon 97214
Phone:  (503) 525-2725  Fax:  (503) 296-5454
LEAD COUNSEL – *Pro Hac Vice*

*Attorneys for Plaintiffs Earth Island Institute, Greenpeace USA, and Sequoia Forestkeeper*

Daniel Galpern, OSB No. 061950
Law Offices of Daniel M. Galpern
2495 Hilyard St., Suite A
Eugene, Oregon 97405
Phone:  (541) 968-7164  Fax:  (971)244-9035
Email:  dan.galpern@gmail.com
*Pro HacVice*

*Attorney for Plaintiff James Hansen*

René P. Voss, California State Bar No. 255758
Natural Resources Law
15 Alderney Road
San Anselmo, CA  94960
Phone:  (415) 446-9027  Fax:  (267) 316-3414
Email:  renepvoss@gmail.com
LOCAL COUNSEL

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| EARTH ISLAND INSTITUTE, et al. | No.:  3:19-cv-05792-LB |
| Plaintiffs, | |
| v. | **MEMORANDUM IN SUPPORT OF PLAINTIFFS' *EX PARTE* MOTION FOR TRO AND PRELIMINARY INJUNCTION** |
| KIMBERLY NASH, et al.**,** | Administrative Procedure Act, 5 U.S.C. §§ 701 et seq. |
| Defendants | |

No.:  3:19-cv-05792-LB - MEMORANDUM IN SUPPORT OF
MOTION FOR TRO AND PRELIMINARY INJUNCTION

Crag Law Center
*3141 E Burnside Street
Portland, Oregon 97214
Tel. 503-525-2725*

# TABLE OF CONTENTS

INTRODUCTION AND NEED FOR EMERGENCY RELIEF ...................................................1

STATEMENT OF FACTS ...................................................................................................1

STANDARD OF REVIEW ..................................................................................................4

APPLICABLE LAW ...........................................................................................................5

    A.    NEPA ...................................................................................................5

    B.    HUD's Environmental Regulations – 24 CFR Part 58 ........................................6

    C.    The Disaster Relief Appropriations Act of 2013 (PL 113-2) .............................7

    D.    The Administrative Procedures Act ....................................................................7

ARGUMENT .....................................................................................................................8

I.    Plaintiffs Have Standing ..................................................................................8

II.    Plaintiffs are Likely to Succeed on the Merits .................................................9

    A.    The Agencies have violated NEPA and HUD regulations because they failed to update their EISs when presented with new information and changed circumstances.................................................................................9

    B.    HUD and HCD Have Violated NEPA Because They Must Analyze Two Connected, and Cumulative Actions Together ..................................................14

    C.    The Logging Activities are an Impermissible Use of Disaster Relief Funding ............................................................................................................17

III.    Plaintiffs Will Suffer Irreparable Harm Absent an Injunction.........................19

IV.    The Balance of Equities and Public Interest Tip Sharply in Plaintiffs' Favor...............20

V.    The Bond Requirement Should be Waived .....................................................21

CONCLUSION.................................................................................................................23

No.:  3:19-cv-05792-LB - MEMORANDUM IN SUPPORT OF
MOTION FOR TRO AND PRELIMINARY INJUNCTION - i

Crag Law Center
*3141 E Burnside Street*
*Portland, Oregon 97214*
*Tel. 503-525-2725*

1

**TABLE OF AUTHORITIES**

2

**CASES**

3    *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131–32 (9th Cir. 2011) ...... 4, 5, 19, 20
     *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240 (1975).......................................22
4    *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531 (1987)...............................................5, 19, 20
     *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208 (9th Cir. 1998). ....... 5, 15, 17
5    *Cal. ex rel. Van De Kamp v. Tahoe Reg'l Planning Agency*, 766 F.2d 1319 (9th Cir. 1985). 22, 23
6    *Center for Biological Diversity v. U.S. Forest Serv.*, 349 F.3d 1157 (9th Cir. 2003) ................... 6
     *City of Carmel-By-The-Sea v. U.S. Dep't of Transp.*, 95 F.3d 892 (9th Cir. 1996) ................... 10
7    *Division 1, Detroit Brotherhood of Locomotive Engineers v. CONRAIL*, 844 F.2d 1218 (6th Cir.
        1998) ................................................................................................................................. 23
8    *Earth Island Inst. v. U.S. Forest Serv.*, 351 F.3d 1291 (9th Cir. 2003) ............................... 15, 20
9    *Earth Island Inst. v. U.S. Forest Serv.*, 442 F.3d 1147 (9th Cir. 2006) ............................. 5, 20, 21
     *Friends of the Clearwater v. Dombeck*, 222 F.3d 552 (9th Cir. 2000)).................................. 13, 14
10   *Friends of the Earth v. Carey*, 535 F.2d 172 (2nd Cir. 1976) ................................................... 23
     *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167 (2000)................... 8
11   *Habitat Educ. Ctr. v. U.S. Forest Service*, 607 F.3d 453 (7th Cir. 2010)................................... 23
12   *Johnson v. Couturier*, 572 F.3d 1067 (9th Cir. 2009)................................................................ 21
     *Jorgensen v. Cassiday*, 320 F.3d 906 (9th Cir. 2003)............................................................... 21
13   *Klamath-Siskiyou Wildlands Ctr. v. BLM*, 387 F.3d 989, 998 (9th Cir. 2004)........................... 16
     *Kleppe v. Sierra Club*, 427 U.S. 390 (1976)................................................................... 15, 17
14   *Lands Council v. McNair*, 537 F.3d 981, 1004 (9th Cir. 2008)................................................... 5
     *Lands Council v. Powell*, 395 F.3d 1019 (9th Cir. 2005)........................................................... 10
15   *League of Wilderness Defenders/Blue Mts. Biodiversity Project v. Connaughton*, 752 F.3d 755
16      (9th Cir. 2014). .................................................................................................................... 21
     *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ........................................................... 8, 9
17   *Marsh v. Oregon Natural Res. Council*, 490 U.S. 360 (1989) ................................................... 10
     *N. Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067 (9th Cir. 2011) ................... 10
18   *Native Ecosystems Council v. Dombeck*, 304 F.3d 886 (9th Cir. 2002) ................................... 15
19   *Natural Resources Defense Council, Inc. v. Morton*, 337 F.Supp. 167 (D.D.C. 1971)............... 22
     *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1362 (9th Cir. 1988). ............................ 5
20   *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332 (1989) ........................................... 5
     *Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113 (9th Cir. 2005) ......................................... 23
21   *Seattle Audubon Soc'y v. Espy*, 998 F.2d 699 (9th Cir. 1993)................................................... 10
22   *Sierra Club v. Bosworth*, 510 F.3d 1016 (9th Cir. 2007)........................................................... 20
     *Sierra Club v. U.S. Dept. of Transp.*, 310 F. Supp. 2d 1168 (D. Nev. 2004) ........................... 13
23   *Summers v. Earth Island Inst.*, 555 U.S. 488, 494 (2009) ................................................... 8, 9
     *Thomas v. Peterson*, 753 F.2d 754 (9th Cir. 1985);................................................................. 15
24   *W. Org. of Res. Council v. Johanns (In re Geertson Seed Farms)*, 541 F.3d 938 (9th Cir. 2008). 5
25   *Warm Springs Dam Task Force v. Gribble*, 621 F.2d 1017 (9th Cir. 1980) ....................... 10, 14
     *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) ................................................... 4

26

**STATUTES**

27   5 U.S.C. § 702 (2018) ...............................................................................................................7
28   5 U.S.C. § 704 (2018) ...............................................................................................................7

Crag Law Center
*3141 E Burnside Street*
*Portland, Oregon 97214*
*Tel. 503-525-2725*

5 U.S.C. § 706(2) (2018) ............................................................................................... 8
42 U.S.C § 5304(g) (2018) ........................................................................................... 6
42 U.S.C §§ 5121 *et seq.* ............................................................................................ 7
42 U.S.C. § 4332(2)(C) ............................................................................................ 6, 9
42 U.S.C. § 5301 et. seq. (2019) ............................................................................... 18
42 U.S.C. § 5305 (2018) ....................................................................................... 7, 18
Disaster Relief Appropriations Act of 2013 (P.L.113−2, 127 Stat. 4) .............. 7, 11, 17, 18, 23

**OTHER AUTHORITIES**

*Note, Recovery for Wrongful Interlocutory Injunctions Under Rule 65(c)*, 99 Harv. L. Rev. 828
    (1986) ........................................................................................................................ 22

**RULES**

24 CFR Part 58 ........................................................................................................ 6, 9
24 C.F.R § 58.53 .................................................................................................... 7, 10
24 C.F.R. § 58.1(b)(1) (2019) ..................................................................................... 6
24 C.F.R. § 58.10 (2019) ............................................................................................ 6
24 C.F.R. § 58.30 (2019) ............................................................................................ 6
24 C.F.R. § 58.32 ........................................................................................................ 6
24 C.F.R. § 58.32(a) ............................................................................................... 7, 16
24 C.F.R. § 58.32(c) (2019) ................................................................................ 7, 16, 17
24 C.F.R. § 58.32(d) (2019) ................................................................................. 7, 16
24 C.F.R. § 58.4 (2019) ............................................................................................... 6
24 C.F.R. § 58.5 .......................................................................................................... 6
24 C.F.R. § 58.52 (2019) ........................................................................................ 7, 10
24 C.F.R. § 58.60 (2019) ........................................................................................ 7, 10
40 C.F.R. § 1502.4(a) (2019) ................................................................................ 14, 16
40 C.F.R. § 1502.9(c)(1)(2019). ............................................................................... 13
40 C.F.R. § 1506.3 (2019) .......................................................................................... 9
40 C.F.R. § 1508.18(b)(3) (2019) ............................................................................. 14
40 C.F.R. § 1508.18(b)(4) (2019) ............................................................................... 9
40 C.F.R. § 1508.25 ............................................................................................. 15, 17
40 C.F.R. § 1508.25(a)(2) (2019) ............................................................................. 15
40 C.F.R. § 1508.25(a) ..................................................................................... 14, 15, 17
40 C.F.R. Parts 1500 through 1508 ............................................................................ 6
Fed. Rule of Civ. Pro. 65(c) ..................................................................................... 21

Crag Law Center
*3141 E Burnside Street*
*Portland, Oregon 97214*
*Tel. 503-525-2725*

1

## INTRODUCTION AND NEED FOR EMERGENCY RELIEF

2
3
4
5

Plaintiffs seek emergency relief to stop HUD from improperly passing federal disaster funding through the State of California and to the Forest Service, which is using the funding to pay for unnecessary and destructive forest clearcutting and razing, pesticide application and subsequent replanting on post-fire forestland that, on its own, is well on the way to recovery.

6
7
8
9
10
11
12
13
14

 HUD granted $70 million in disaster relief funds to the California Housing and Community Development Department of the State of California ("HCD") and HCD, in turn, passed them on to the Forest Service to log approximately 3,000 acres of recently burned forests that are naturally recovering, and have healthy conifer regrowth and ample wildlife presence. Plaintiffs are entitled to relief on the following bases: 1) the project is not eligible for funding as a disaster relief activity; 2) defendants relied on stale, outdated and factually incorrect NEPA documents that were prepared by the Forest Service using data collected five years ago; and 3) defendants failed to analyze the impacts of a connected action: the construction of biomass power plant using the same grant funding.

15
16
17
18
19
20
21
22
23
24

Despite plaintiffs' repeated requests for supplemental environmental review, defendants have moved ahead with logging. Defendants have also changed the project since the NEPA analysis was done; they are now clearcutting all live and dead trees, regardless of size—rather than logging standing dead trees for dimensional lumber, the project analyzed in the adopted EISs. Defendants' actions are ongoing and will continue unless this court enjoins certain logging activities.  Plaintiffs seek a temporary injunction so that the court may have the time it needs to assess the merits of plaintiffs' claims before more harm occurs. As set forth below, plaintiffs are likely to succeed on the merits and have shown the potential for further irreparable harm to the Stanislaus National Forest.  Plaintiffs request relief to enjoin further activities until this court can make a decision on the merits.

25

## STATEMENT OF FACTS

26
27
28

In 2015, the state of California applied to HUD for $70 million in federal disaster relief funding through the National Disaster Relief Competition ("NDRC"). California's application proposed to fund a programmatic effort called the "Community Watershed Health and Resilience

Crag Law Center
3141 E Burnside Street
Portland, Oregon 97214
Tel. 503-525-2725

1   Program." *See* Declaration of Meriel Darzen (Darzen Decl.) Ex. 1. This program was slated as an

2   "integrated, replicable model for community and watershed resilience." *Id.* at 3. The program

3   consists of three "pillars": $28 million for the "Forest and Watershed Health" project; $22

4   million for a "Biomass Utilization Facility"; and $20 million for "Community Resilience

5   Centers(s)". Darzen Decl. Ex. 2. The Forest and Watershed Health Program ("FWHP") involves

6   "removing dead material from forests that act as fuel" on up to 4,600 acres and replanting trees

7   on up to 4,500 acres (the "logging project" or the "project"). *Id.* The Biomass Utilization Facility

8   ("biomass power plant") involves building a new biomass power plant and/or wood processing

9   facility. The lead agency for California that administers the grant funding is the Department of

10  Housing and Community Development ("HCD"). On June 7, 2016, HUD awarded HCD $70

11  million in disaster relief funds through the NDRC. Darzen Decl. Ex. 3.

12          On May 17, 2017, HCD issued a public notice for comment on HCD's adoption of two

13  earlier-issued U.S. Forest Service EISs (the "2014 and 2016 EISs") as part of the environmental

14  review of the FWHP component of the California grant. Darzen Dec. Exs. 4, 8, 9. In the public

15  notice, HCD also stated its intent to submit a request to HUD for the release of the $28 million in

16  disaster relief funding to pay for the logging project. Plaintiff Earth Island Institute submitted

17  comments to HCD on June 26, 2017 asking HCD not to adopt the 2014 and 2016 EISs and

18  withdraw its proposal to accept the disaster relief funds. *See* Declaration of Dr. Chad Hanson

19  (Hanson Decl.), Ex. 3. The comments explained that the proposed logging project would 1)

20  severely undermine California's climate change goals; 2) destroy abundant forest regeneration

21  that had substantially increased since the Forest Service's data supporting the EISs; 3) strip

22  vegetation from thousands of acres of post-fire growth where soil has re-stabilized; and 4)

23  destroy thousands of acres of unique, ecologically vital, post-fire habitat. The comment letter

24  included data collected by plaintiffs demonstrating the levels of natural tree regeneration in the

25  areas proposed for logging in the project. The letter also asked defendants to account for the

26  additional greenhouse gas emissions that the logging project would produce because of the

27  changes to the project than what was first contemplated and analyzed in the two EISs. *Id.* Neither

28  HCD nor the Forest Service responded to that letter and no additional analysis was completed.

No.:  3:19-cv-05792-LB - MEMORANDUM IN SUPPORT OF
MOTION FOR TRO AND PRELIMINARY INJUNCTION - 2

Crag Law Center
*3141 E Burnside Street*
*Portland, Oregon 97214*
*Tel. 503-525-2725*

1   HCD moved forward with adopting the EISs unchanged to satisfy its obligations under NEPA

2   and requested release of the HUD funds. Darzen Decl., Exs. 5, 6.

3        On October 23, 2017, Plaintiff Earth Island Institute sent HUD a letter objection to the

4   release of the disaster relief funds, again explaining to HUD and HCD in their objection that

5   circumstances in the project area had changed and that there would be different impacts than

6   were analyzed in the adopted EISs. Hanson Decl. Ex. 4. HUD acknowledged the objection and

7   sent a letter to HCD requesting that it respond to the objection. Hanson Decl., Ex. 5. HCD

8   responded that circumstances had not changed and that the EISs were not outdated. Hanson Decl.

9   Ex. 6. HCD also claimed that no changes were being made to the proposed activities from those

10  proposed in the 2014 and 2016 EISs and that "only dead trees are being proposed for treatment."

11  Hanson Decl. Ex. 5, p. 4. HUD denied plaintiff's objection to the release of funds and released

12  the Disaster Relief Act funds to HCD without requiring any further environmental review.

13  Hanson Decl., Ex. 7. The state of California then passed the funds to the Forest Service to be

14  used for logging. Decl. Darzen, Ex. 7.

15       Plaintiffs wrote to HCD and HUD on June 6, 2018. Hanson Decl., Ex. 8. This letter

16  provided a summary of new data collected by plaintiffs in 2018 confirming earlier findings that

17  regeneration was occurring in much larger concentrations than was analyzed in the EISs. *Id.*

18  Plaintiffs demonstrated that at least 50% of the Forest Service's field plots, for which the Forest

19  Service reported no conifer regeneration in 2014/2015, had natural regeneration as of 2018 and

20  that the regeneration was pine-dominated, not white fir as the Forest Service previously assumed.

21  Id. at p. 5-7.  The June 2018 letter included this updated data as well as photographs depicting

22  specific plots where regeneration had occurred where the Forest Service had previously reported

23  zero regeneration. The letter also included reports of wildlife occupying the project area,

24  including great grey owls, goshawk, California spotted owl and fisher. *Id.* In response to a 2018

25  FOIA request, the Forest Service confirmed that it had not done any additional surveys of conifer

26  regeneration in the project area between 2016 and 2018. Decl. Hanson, Ex. 9.

27       On May 30, 2019 defendants HCD and the Forest Service and plaintiffs attended a site

28  visit together in the project area. Hanson Decl., ¶ 22. Plaintiffs were optimistic that if the Forest

No.:  3:19-cv-05792-LB - MEMORANDUM IN SUPPORT OF
MOTION FOR TRO AND PRELIMINARY INJUNCTION - 3

Crag Law Center
*3141 E Burnside Street*
*Portland, Oregon 97214*
*Tel. 503-525-2725*

Service and HCD officials saw the extensive conifer regeneration that they would reconsider the project. *Id.* During the site visit, which was attended by numerous Forest Service officials and staff from HCD, the group only visited one of the units in which there is extensive conifer regeneration. *Id*. Plaintiffs asked HCD to consider halting the logging project, however the HCD official indicated that this was not be possible as the funds were already dispersed. *Id.*

Because of the constrained scope of the site visit, plaintiffs set out to document the tree growth and regeneration at or above the levels set in the EISs in several units that were slated to be cut. *See* Declaration of Tonja Chi (Chi Decl.) ¶¶ 15-18.  Plaintiffs sent a letter on August 14, 2019 to HCD and HUD documenting this additional information and requesting that HUD refrain from logging certain units with intact post-fire snag forests with extensive regeneration and use by wildlife.  Hanson Decl. Ex. 10. That letter also included a new Forest Service study by North et. al. which contradicted the claimed need to replant post-fire areas and the California Environmental Protection Agency notice listing the herbicide glyphosate, which is now being proposed for application within the project, as causing cancer. *Id.*

To date, over 1,200 acres have been logged, razed and disturbed using disaster relief funds. Both live trees and dead trees have been cut, along with almost all other vegetation. The Forest Service intends to log at least 1,800 more acres of live and dead trees and then spray herbicides.

## STANDARD OF REVIEW

A plaintiff seeking a preliminary injunction "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  Courts may apply a "sliding scale" approach in their consideration of the success and harm factors.  *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131–32 (9th Cir. 2011).  Under this approach, "[f]or example, a stronger showing of irreparable harm to plaintiff might offset a lesser showing of likelihood of success on the merits."  *Id.* at 1131. Plaintiffs need only raise "serious questions going to the merits," so

No.:  3:19-cv-05792-LB - MEMORANDUM IN SUPPORT OF
MOTION FOR TRO AND PRELIMINARY INJUNCTION -  4

Crag Law Center
*3141 E Burnside Street*
*Portland, Oregon 97214*
*Tel. 503-525-2725*

long as they can demonstrate that the balance of hardships tips sharply in their favor. *Id.* at 1135. "Serious questions" are those that are "substantial, difficult, and doubtful" enough to require more thorough investigation. *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1362 (9th Cir. 1988).

Further, "[i]f environmental injury is sufficiently likely, the balance of harms will usually favor the issuance of an injunction to protect the environment." *W. Org. of Res. Council v. Johanns (In re Geertson Seed Farms)*, 541 F.3d 938, 944 (9th Cir. 2008) (citing *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987)). The reason is that "[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.,* irreparable." *Alliance for the Wild Rockies*, 632 F.3d at 1135 (quoting *Lands Council v. McNair*, 537 F.3d 981, 1004 (9th Cir. 2008) (*en banc*)). NEPA requires an agency to take a "hard look" at the consequences of its actions, which "should involve a discussion of adverse impacts that does not improperly minimize negative side effects." *Earth Island Inst. v. U.S. Forest Serv.*, 442 F.3d 1147, 1159 (9th Cir. 2006). Thus, the Forest Service must "undertake a thorough environmental analysis before concluding that no significant environmental impact exists." *Id.*

## APPLICABLE LAW

### A. NEPA

NEPA is "our basic national charter for protection of the environment." *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1215–16 (9th Cir. 1998). NEPA requires that: (1) agencies take a "hard look" at the environmental impacts of their actions by ensuring that they "will have available, and will carefully consider, detailed information concerning significant environmental impacts;" and (2) "the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). NEPA "emphasizes the importance of coherent and comprehensive up-front environmental analysis to ensure informed decision making to the end that the agency will not

No.: 3:19-cv-05792-LB - MEMORANDUM IN SUPPORT OF
MOTION FOR TRO AND PRELIMINARY INJUNCTION - 5

Crag Law Center
*3141 E Burnside Street*
*Portland, Oregon 97214*
*Tel. 503-525-2725*

1  act on incomplete information, only to regret its decision after it is too late to correct." *Center*

2  *for Biological Diversity v. U.S. Forest Serv.*, 349 F.3d 1157, 1166 (9th Cir. 2003) (citation

3  omitted).

4      To accomplish these purposes, NEPA requires all federal agencies to prepare a "detailed

5  statement" [an EIS] that discusses the environmental impacts of all "major Federal actions

6  significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C).

7      **B.      HUD's Environmental Regulations – 24 CFR Part 58**

8      Under the Housing and Community Development Act of 1974, HUD and recipients of

9  HUD funding must account for and analyze the environmental impacts of projects and activities

10  that HUD funds. 42 U.S.C § 5304(g) (2018). HUD must ensure compliance with NEPA and

11  other applicable environmental laws. *Id.*; 24 C.F.R. § 58.10 (2019). The regulations governing

12  this environmental review are found in 24 C.F.R. Part 58. These regulations apply to activities

13  funded with Disaster Relief Act funding. 24 C.F.R. § 58.1(b)(1) (2019). Under 24 C.F.R. Part 58,

14  the "responsible entity" is the recipient of HUD funding. HUD has ultimate and continuing

15  responsibility for NEPA compliance, and it may choose to rely on the analysis prepared by

16  responsible entities for environmental review, decision-making and action that applies to HUD

17  under NEPA. 24 C.F.R. §§ 58.4, 58.5, 58.10 (2019). The responsible entity must certify that it

18  has complied with NEPA and the CEQ regulations (40 C.F.R. Parts 1500 through 1508) and

19  other applicable environmental laws before requesting release of funds. 24 C.F.R. §§ 58.5, 58.10

20  (2019).

21      "Environmental review" for the purposes of 24 C.F.R. Part 58 is "all of the actions that a

22  responsible entity must take to determine compliance with [24 C.F.R. Part 58]." 24 C.F.R. §

23  58.30 (2019). This includes ensuring NEPA compliance for actions that are funded by HUD as

24  well as those that may not be funded by HUD but are aggregated by the responsible entity in

25  accordance with 24 C.F.R. § 58.32. *Id.* The responsible entity must "group together and evaluate

26  as a single project" all individual activities that are related on a geographic or functional basis so

27  that the responsible entity can adequately address and analyze, in a single environmental review,

28  "the separate and combined impacts of activities that are similar, connected and closely related,

No.:  3:19-cv-05792-LB - MEMORANDUM IN SUPPORT OF
MOTION FOR TRO AND PRELIMINARY INJUNCTION -  6

Crag Law Center
*3141 E Burnside Street*
*Portland, Oregon 97214*
*Tel. 503-525-2725*

1   or that are dependent upon other activities and actions," and consider reasonable alternative

2   actions. 24 C.F.R. §§ 58.32(a),(c) (2019). When a recipient's planning and program development

3   provide for activities to be implemented over more than two years, the environmental review

4   should consider "the relationship among all component activities of the multi-year project,

5   regardless of the source of funds and address and evaluate their cumulative environmental

6   effects." 24 C.F.R. § 58.32(d) (2019). The responsible entity also has a duty to reevaluate and

7   update its environmental findings (including an adopted EIS) when the project changes in nature,

8   magnitude or extent, including adding new activities not anticipated in the original scope of the

9   project, or when there are new circumstances and environmental conditions that affect the project

10   or its impacts or the recipient proposes an alternative not considered in the original finding. 24

11   C.F.R. §§ 58.52, 58.53, 58.60 (2019).

12      **C.**     **The Disaster Relief Appropriations Act of 2013 (PL 113-2)**

13        Congress enacted the Disaster Relief Appropriations Act of 2013 (P.L.113−2, 127 Stat. 4)

14   ("the Disaster Relief Act") following Hurricane Sandy in order to provide funding for disaster

15   recovery efforts in "the most impacted and distressed areas" resulting from major disasters

16   declared as such pursuant to the Stafford Act (42 U.S.C §§ 5121 *et seq*.). Funds were allocated

17   through this Act to HUD's Community Development Block Grant ("CDBG") program for

18   "necessary expenses related to disaster relief, long-term recovery, restoration of infrastructure

19   and housing, and economic revitalization." Activities eligible for funding are set out in 42 U.S.C.

20   § 5305 (2018). The funding was intended to help state and local governments meet needs for

21   public infrastructure like hospitals, utilities and roads, repairs for small businesses, rental

22   assistance, and other community development projects.

23      **D.**     **The Administrative Procedures Act**

24        The APA confers a right of judicial review on any person adversely affected by agency

25   action. 5 U.S.C. § 702 (2018). "Agency action made reviewable by statute and final agency

26   action for which there is no other adequate remedy in a court are subject to judicial review." 5

27   U.S.C. § 704 (2018).  Upon review, a court shall hold unlawful and set aside agency actions

28

No.:  3:19-cv-05792-LB - MEMORANDUM IN SUPPORT OF
MOTION FOR TRO AND PRELIMINARY INJUNCTION -  7

Crag Law Center
*3141 E Burnside Street*
*Portland, Oregon 97214*
*Tel. 503-525-2725*

found to be arbitrary, capricious, an abuse of discretion, otherwise not in accordance with and/or without observance of procedure required by law, or in excess of statutory authority. 5 U.S.C. § 706(2) (2018).

## ARGUMENT

### I.  Plaintiffs Have Standing

As a threshold matter, Plaintiffs have standing to pursue this action because its members will be harmed by the agencies' imminent action to allow logging of trees in newly regenerated post-fire habitat. Plaintiffs' injury is fairly traceable to the implementation of the logging project, and a favorable judicial decision will prevent or redress the injury. Plaintiffs have standing. *See Summers v. Earth Island Inst.*, 555 U.S. 488, 494 (2009) ("While generalized harm to the forest or the environment will not alone support standing, if that harm in fact affects the recreational or even the mere esthetic interests of the plaintiff, that will suffice."). Plaintiffs have provided extensive declarations demonstrating injury to their interests and ongoing and continuing use and enjoyment of the area. *See* Declaration of Ara Marderosian (Marderosian Decl.) ¶¶ 7–10; Hanson Decl. ¶¶ 7–11; Declaration of Amy Moas (Moas Decl.) ¶¶ 6–12; Declaration of Daniel Brindis (Brindis Decl.), ¶¶ 4–7; *see Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.,* 528 U.S. 167, 183 (2000) ("[E]nvironmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity."); *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 562–63 (1992) ("[T]he desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purpose of standing.").

Because its members have standing, Plaintiffs have associational standing. *See Friends of the Earth*, 528 U.S. at 169 ("An association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."). Plaintiffs' injuries are caused by the Forest Service's logging and ground disturbing activities. *See* Moas Dec. ¶ 12; Hanson

1    Dec. ¶ 12.

2         The Supreme Court uses a "relaxed" standard for redressability where plaintiffs seek to

3    enforce a procedural right the deprivation of which causes them to suffer concrete injuries in

4    fact. *Summers*, 555 U.S. at 496 ("Only a 'person who has been accorded a procedural right to

5    protect his concrete interests can assert that right without meeting all the normal standards for

6    redressability and immediacy.'") (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 572 n.7

7    (1992), emphasis added by *Summers*).  While the violations here are procedural, they come with

8    significant substantive impact.  As a result of HUD, HCD and the Forest Service's failure to

9    consider new information and changed circumstances, and their failure to analyze the impacts of

10   the proposed biomass power plant in the same environmental analyses as the logging project as

11   required by 24 C.F.R. Part 58 and NEPA, Plaintiffs are being injured by defendants' ongoing

12   logging and vegetation removal. Granting the requested relief will redress Plaintiffs' injuries.

13   By compelling the HUD, HCD and the Forest Service to follow applicable laws, the defendants

14   will be required to consider the extensive conifer regeneration, the use of the post-fire habitat by

15   wildlife and the increased greenhouse gas emissions from logging for biomass power generation.

16   Doing so could lessen or eliminate Plaintiffs' and their members' injuries.  Hanson Decl.  ¶ 25.

17   For these reasons, Plaintiffs have standing.

18   **II.    Plaintiffs are Likely to Succeed on the Merits**

19          **A.    The Agencies have violated NEPA and HUD regulations because they failed**
20                 **to update their EISs when presented with new information and changed**
                   **circumstances.**

21          NEPA requires that federal agencies prepare a detailed EIS for any major federal action

22   that may significantly affect the quality of the human environment. 42 U.S.C. § 4332(2)(C)

23   (2018); 40 C.F.R. § 1508.18(b)(4) (2019). An agency may adopt an EIS prepared by another

24   federal agency; however, an agency must undertake an independent review of another agency's

25   EIS before adopting it and "conclude[] that its comments and suggestions have been satisfied."

26   40 C.F.R. § 1506.3 (2019).

27

28

No.:  3:19-cv-05792-LB - MEMORANDUM IN SUPPORT OF
MOTION FOR TRO AND PRELIMINARY INJUNCTION -  9

Crag Law Center
*3141 E Burnside Street*
*Portland, Oregon 97214*
*Tel. 503-525-2725*

1   Agencies cannot rely on stale, outdated or incomplete NEPA analyses and have a duty to

2   update their EISs as needed. *See Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 371–72

3   (1989); *Warm Springs Dam Task Force v. Gribble*, 621 F.2d 1017, 1023 (9th Cir. 1980) ("We

4   start with the premise that a federal agency has a continuing duty to gather and evaluate new

5   information relevant to the environmental impact of its actions."). When "new information

6   comes to light the agency must consider it, evaluate it, and make a reasoned determination

7   whether it is of significance as to require formal NEPA filing procedures." *Warm Springs*, 621

8   F.2d at 1024. "Reliance on stale scientific information is sufficient to require re-examination of

9   an EIS." *City of Carmel-By-The-Sea v. U.S. Dep't of Transp.,* 95 F.3d 892, 900 (9th Cir. 1996)

10  (quoting *Seattle Audubon Soc'y v. Espy*, 998 F.2d 699, 704–705 (9th Cir. 1993) stating that,

11  because the EIS rested on "stale scientific evidence" and contained an incomplete discussion of

12  environmental effects and false assumptions, it was proper to set aside the EIS); *N. Plains Res.*

13  *Council, Inc. v. Surface Transp. Bd.,* 668 F.3d 1067, 1086 (9th Cir. 2011) (holding that the

14  agency did not take a "hard look" under NEPA because it relied on stale surveys and data in its

15  EIS); *Lands Council v. Powell*, 395 F.3d 1019, 1031 (9th Cir. 2005) (finding that six-year-old

16  data, without updated habitat surveys, was too stale).

17      Similarly, under HUD regulations, the responsible entity must reevaluate and update its

18  environmental findings (including an adopted EIS) when the project changes in nature,

19  magnitude or extent, including adding new activities not anticipated in the original scope of the

20  project, or when there are new circumstances and environmental conditions that affect the project

21  or its impacts or the recipient proposes an alternative not considered in the original finding. 24

22  C.F.R. §§ 58.52, 58.53, 58.60 (2019).

23      In this case, the project has changed in nature, new activities have been added or

24  substituted, there is significant new environmental information that has not been incorporated

25  into the EISs and there are new circumstances and conditions on the ground that affect the

26  project. Hanson Decl., Exs. 3, 4, 10; Chi Decl. 18-20.  Plaintiffs have diligently and persistently

27  made defendants aware of these changes and new information, and requested that they reevaluate

28

No.:  3:19-cv-05792-LB - MEMORANDUM IN SUPPORT OF
MOTION FOR TRO AND PRELIMINARY INJUNCTION -  10

Crag Law Center
*3141 E Burnside Street*
*Portland, Oregon 97214*
*Tel. 503-525-2725*

the proposed actions in light of those changes and new information. Plaintiffs first sent HCD and the Forest Service a letter on June 26, 2017 explaining that conifer regeneration in the project area was much higher than analyzed in the 2014 and 2016 EIS. Hanson Decl., Ex. 3 This letter included data showing the regeneration in 32 plots across the project areas along with photographs of the regeneration. *Id.* The letter also made defendants aware that additional analysis of greenhouse gas emissions was needed because project treatments contemplated by the logging project were different than those contemplated by the Forest Service EISs. *Id.* Neither HCD nor the Forest Service responded to that letter and no additional analysis was completed. HCD moved forward with adopting the EISs unchanged, in purported satisfaction of its obligations under NEPA, and requested release of the HUD funds. Darzen Decl, Exs. 5, 6.

In accordance with HUD regulations, Plaintiffs properly objected to the release of the disaster relief funds, again explaining to HUD and HCD in their objection that circumstances in the project area had changed and that there would be different impacts than were analyzed in the adopted EISs. Hanson Decl., Ex. 4. HCD categorically denied that any circumstances had changed or that the EISs were outdated. HCD also claimed that no changes were being made to the proposed activities from those proposed in the 2014 and 2016 EISs and that "only dead trees are being proposed for treatment." Hanson Decl., Ex 6, p. 4 . This has proven to be untrue, as plaintiffs have documented the extensive logging of live trees across project area. Chi Decl., ¶ 22; Hanson Decl., ¶ 11. The logging and ground disturbing activities that are occurring in all units, based on plaintiffs' observations and data collection, involve cutting all vegetation, both live and dead, for either biomass or to be piled and burned onsite. This type of clearcutting and burning is distinct and changed from the "fuel reduction treatments" analyzed in the 2014 and 2016 EISs, which analyzed the then proposed plan to log standing dead trees for lumber. HUD denied plaintiffs objection to the release of funds and proceeded to release Disaster Relief Act funds to HCD without requiring any further environmental review. Hanson Decl., Ex. 7.

Plaintiffs again wrote to HCD and HUD on June 6, 2018. Hanson Decl., Ex. 8. This letter provided a summary of new data collected by plaintiffs in 2018 confirming earlier findings that regeneration was occurring in much larger concentrations than was analyzed in the EISs. *Id.*

No.:  3:19-cv-05792-LB - MEMORANDUM IN SUPPORT OF
MOTION FOR TRO AND PRELIMINARY INJUNCTION -  11

Crag Law Center
*3141 E Burnside Street*
*Portland, Oregon 97214*
*Tel. 503-525-2725*

1    The letter presented data that demonstrated that at least 50% of the Forest Service's field plots,

2    for which the Forest Service reported no conifer regeneration in 2014/2015, had natural

3    regeneration as of 2018 and that the regeneration was pine-dominated, not white fir dominated as

4    the Forest Service previously assumed. *Id.* at 4-7.  The June 2018 letter included this updated

5    data as well as photographs depicting specific plots where regeneration had occurred where the

6    Forest Service had previously reported zero regeneration. The letter also included reports of

7    wildlife occupying the project area, including great grey owls, goshawk, California spotted owl

8    and fisher. *Id.* In response to a 2018 FOIA request, the Forest Service confirmed that it had not

9    done any additional surveys of conifer regeneration in the project area between 2016 and 2018.

10   Hanson Decl, Ex 9.

11        On May 30, 2019 defendants HCD, the Forest Service and plaintiffs made a site visit in

12   the project area. Hanson Decl., ¶ 22. It was attended by numerous Forest Service officials, as

13   well as staff from HCD.  But the group visited only one of the units despite plaintiffs' requests to

14   visit multiple units. *Id.*  This unit had extensive conifer regeneration, and plaintiffs hoped that

15   HCD would reconsider using the HUD's disaster relief funds to log these naturally regenerated

16   forests.  *Id.*

17        Following the site visit, plaintiffs documented additional new tree growth and restocking

18   above the levels in the EISs in several units slated to be cut. Hanson Decl., Ex 10; Chi Decl. ¶¶

19   14–18.  The Plaintiffs sent another letter on August 14, 2019 to HCD and HUD documenting this

20   additional information and requesting that HUD refrain from logging certain units with extensive

21   regeneration and use by wildlife had been documented. Hanson Decl. Ex. 10. Plaintiffs' August

22   14 letter also included a new Forest Service study by North et. al. which contradicts the need to

23   do replanting in most post-fire areas,[1] and a new study outlining the negative impacts of the

24   herbicide glyphosate—the use of which was not analyzed in the EISs. *Id.*

26        [1] North et al. (2019) specifically noted that tree planting, following clearcuts, which is what

27   the Forest Service is doing in project area, will tend to increase, not decrease, intensity of future

No.:  3:19-cv-05792-LB - MEMORANDUM IN SUPPORT OF
MOTION FOR TRO AND PRELIMINARY INJUNCTION -  12

Crag Law Center
*3141 E Burnside Street*
*Portland, Oregon 97214*
*Tel. 503-525-2725*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

     Regulations promulgated by the Council on Environmental Quality ("CEQ") outline when an agency must prepare a supplemental analysis—specifically, when the agency "makes substantial changes in the proposed action that are relevant to environmental concerns"; or when "significant new circumstances or information" arise. 40 C.F.R. § 1502.9(c)(1)(i)–(ii) (2019). When confronted with plaintiffs' request to supplement the 2014 and 2016 EISs, defendants HUD and HCD were required to evaluate the new information and determine whether or not it was of sufficient significance to require a supplemental environmental impact statement ("SEIS"). *Sierra Club v. U.S. Dept. of Transp.*, 310 F. Supp. 2d 1168, 1197 (D. Nev. 2004) (citing *Friends of the Clearwater v. Dombeck*, 222 F.3d 552, 558 (9th Cir. 2000)). Defendants' responses to plaintiffs' request fall far short of their legal duties. HCD, for its part, admitted that it was continuing to rely on the stale data from 2014 and 2015. Hanson Decl. Ex. 6, p. 6. HUD merely accepted verbatim HCD's assertions with no follow up, or fact-checking of its own. Hanson Decl., Ex. 7. Both agencies rely on a bald, unverified assertion that "subsequent visits to [the project area] confirm [the 2014 and 2015] regeneration surveys." Hanson Decl., Ex. 6, p. 6. FOIA and information requests indicate that no formal follow-up surveys were completed by any of the defendants. Hanson Decl., Exs. 9 and 11.

17

18

19

20

21

22

     Plaintiffs have submitted extensive data and photographs that the impacts of cutting the new tree regeneration include the destruction of occupied habitat for birds including great grey owls, blackbacked woodpeckers and other nesting birds that utilize the new growth for their nesting and roosting. Hanson Decl. ¶ 9, Ex. 2; Chi Decl. ¶ 20; Kholsa Decl., Ex. 1; Declaration of Howard Jennings (Jennings Decl.), ¶¶ 7-12, Ex 1. Plaintiffs' recent observations from the ground show that the project is not the same as that proposed an analyzed in the EISs and that the

23

24

25

26

27

28

fires.  In addition North et. al. recommends not planting within 200 meters of pockets or edges of live trees, and planting at lower densities where planting does occur, in the event that there is not natural regeneration there.

No.:  3:19-cv-05792-LB - MEMORANDUM IN SUPPORT OF
MOTION FOR TRO AND PRELIMINARY INJUNCTION -  13

Crag Law Center
*3141 E Burnside Street*
*Portland, Oregon 97214*
*Tel. 503-525-2725*

1    agencies have misrepresented what treatments would occur in their NEPA documents. *See*

2    Darzen Decl., Ex. 5, p. 21; Ex. 6, p. 26 (stating that no green or live trees would be cut).

3        In sum, it is indisputable that plaintiffs have repeatedly presented defendants with

4    significant new scientific data and information about the environmental conditions in the project

5    area. The amount of natural, unaided conifer regeneration is significant in the context of a project

6    that is aimed at "restoration" of a post-fire landscape and is funded with disaster recovery funds.

7    These are changed circumstances and new information that warrant a supplemental EIS and also

8    require HCD to reevaluate its findings per 24 C.F.R. § 58.53. Defendants' "failure to evaluate in

9    a timely manner the need to supplement the original EIS[s] in light of that new information

10   violated NEPA." *Friends of the Clearwater*, 222 F.3d at 559; *see also Warm Springs Dam Task*

11   *Force*, 621 F.2d at 1024 (the court should consider "the degree of care with which the agency

12   considered the [new] information," and "the degree to which the agency supported its decision

13   not to supplement with a statement of explanation or additional data"). This is a failure on the

14   part of each of the defendants in turn: the Forest Service is completing the work in reliance on

15   the original 2014 and 2016 EISs, HCD has passed disaster relief funding through to the Forest

16   Service and is the "responsible entity" under federal law, and HUD has a continuing duty, as the

17   administrator of the funds, to ensure compliance with NEPA.

18   **B.      HUD and HCD Have Violated NEPA Because They Must Analyze Two
            Connected, and Cumulative Actions Together**

19

20       NEPA regulations require that "[p]roposals or parts of proposals which are related to

21   each other closely enough to be, in effect, a single course of action shall be evaluated in a single

22   impact statement." 40 C.F.R. § 1502.4(a) (2019); *see also* 40 C.F.R. § 1508.18(b)(3) (2019)

23   ("systematic and connected agency decisions allocating agency resources to implement a specific

24   statutory program or executive directive" are "major federal actions" requiring a single EIS); 40

25   C.F.R. 1508.25(a)(1) (2019) ("connected actions" are "closely related" and thus must be treated

26   in the same EIS where they are "interdependent parts of a larger action.") The Ninth Circuit

27   requires that the analysis be done in a single document when the record raises "substantial

28   questions" about whether there will be "significant environmental impacts" from the collection

No.: 3:19-cv-05792-LB - MEMORANDUM IN SUPPORT OF
MOTION FOR TRO AND PRELIMINARY INJUNCTION - 14

Crag Law Center
*3141 E Burnside Street
Portland, Oregon 97214
Tel. 503-525-2725*

of anticipated projects.  *Blue Mountains Biodiversity Project*, 161 F.3d at 1215; *Thomas v. Peterson*, 753 F.2d 754, 759 (9th Cir. 1985); *see also Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 893–94 (9th Cir. 2002) (applying standard to an EA and holding that "[a] single NEPA review document is required for distinct projects when there is a single proposal governing the projects, [] or when the projects are 'connected,' 'cumulative' or 'similar' actions under the regulations implementing NEPA.") (citing *Kleppe v. Sierra Club*, 427 U.S. 390, 410 (1976).[2]  Subsequent Ninth Circuit case law requires the preparation of a single NEPA analysis for cumulative and connected actions,[3] but not for all similar actions.[4]  *Earth Island Inst. v. U.S. Forest Serv.*, 351 F.3d 1291, 1306 (9th Cir. 2003) (citing 40 C.F.R. § 1508.25).  Section 40

[2] *Kleppe* held that "when several proposals for [] actions that will have cumulative or synergistic environmental impact upon a region are pending concurrently before an agency, their environmental consequences must be considered together."  *Id.* at 410.

[3] *Cumulative actions* are those that, when viewed with other proposed actions, have cumulatively significant impacts and should therefore be discussed in the same impact statement. 40 C.F.R. § 1508.25(a)(2) (2019).  *Connected actions* are those that are closely related and therefore should be discussed in the same impact statement.  Actions are connected if they (i) automatically trigger other actions that may require environmental impact statements, (ii) cannot or will not proceed unless other actions are taken previously or simultaneously, or (iii) are interdependent parts of a larger action and depend on the larger action for their justification.  40 C.F.R. § 1508.25(a)(1) (2019).

[4] *Similar actions* are those that, when viewed with other reasonably foreseeable or proposed agency actions, have similarities that provide a basis for evaluating their environmental consequences together, such as common timing or geography. An agency may wish to analyze these actions in the same impact statement. *It should do so when the best way to assess adequately the combined impacts of similar actions or reasonable alternatives to such actions is to treat them in a single impact statement.*  40 C.F.R. § 1508.25(a)(3) (2019) (emphasis added).

No.:  3:19-cv-05792-LB - MEMORANDUM IN SUPPORT OF
MOTION FOR TRO AND PRELIMINARY INJUNCTION - 15

Crag Law Center
*3141 E Burnside Street*
*Portland, Oregon 97214*
*Tel. 503-525-2725*

1    C.F.R. § 1502.4(a) "directs the agency to use the 'scoping' provisions contained in 40 C.F.R. §

2    1508.25 to determine whether nominally separate proposals are a 'single course of action.' "

3    *Klamath-Siskiyou Wildlands Ctr. v. BLM*, 387 F.3d 989, 998 (9th Cir. 2004).

4         Similarly under HUD regulations, the responsible entity must "group together and

5    evaluate as a single project" all individual activities that are related on a geographic or functional

6    basis so that the responsible entity can adequately address and analyze, in a single environmental

7    review, "the separate and combined impacts of activities that are similar, connected and closely

8    related, or that are dependent upon other activities and actions," and consider reasonable

9    alternative actions. 24 C.F.R. § 58.32(a), (c) (2019). When a recipient's planning and program

10   development provide for activities to be implemented over more than two years, the

11   environmental review should consider "the relationship among all component activities of the

12   multi-year project, regardless of the source of funds and address and evaluate their cumulative

13   environmental effects." 24 C.F.R. § 58.32(d) (2019).

14        In this case, the FWHP logging project and the biomass power plant must be considered a

15   "single course of action" for the purposes of NEPA because they are part of a larger integrated

16   strategy developed by the State of California to respond to the Rim Fire. Similarly, they must be

17   aggregated and their cumulative impacts analyzed under the HUD regulations because they are

18   both geographically and functionally related and they are to be implemented over the course of

19   more than two years. California's entire application for disaster relief funding centers around the

20   integration and interdependence of the FHWP logging project and the biomass power plant

21   (along with the community resilience centers, which are not at issue here). California's grant

22   application describes the FWHP logging project and the biomass power plant as two of the three

23   "integrated pillars" in the larger "Community and Watershed Health Resilience Program." *See*

24   Darzen Decl. Ex 1, p. 3. The diagram of the three pillars shows a direct connection between the

25   FWHP logging component and the biomass powerplant resulting from the thinning and biomass

26   logging, indicating dependency and integration between these two projects. Darzen Decl., Ex. 2.

27   These two components are connected, cumulative and interdependent parts of a larger action,

28   that is the HUD decision to grant California $70 million in disaster relief funding. 40 C.F.R. §

Crag Law Center
*3141 E Burnside Street*
*Portland, Oregon 97214*
*Tel. 503-525-2725*

1508.25(a) (2019). These two components in particular have cumulative and synergistic environmental impacts because they will occur in the same area, both cause habitat degradation due to loss of trees and vegetation in the same area, and both result in increased emissions and loss of carbon in the same area. Thus, they must be analyzed together. *See* Kleppe, 427 U.S. at 410. *See also Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1215 (9th Cir. 1998) (requiring actions to be considered in single EIS where the proposed actions were reasonably foreseeable and were developed as part of a comprehensive forest recovery strategy).

Inexplicably, however, HUD and HCD failed to scope whether the two components should be analyzed together, as required by 40 C.F.R. 1508.25, and included no mention of the biomass powerplant in its notice or decision to adopt the 2014 and 2016 EISs (which, in and of themselves do not mention the facility because it had yet to be proposed when they were created). When members of the public submitted comments to HCD noting the need to analyze the biomass facility in response to HCD's proposal to adopt the EISs unchanged, HCD responded only that the comment was "outside the scope of [the decision to adopt the EISs]." Darzen Decl. Ex. 5, p. 27-28. Thus, while touting the California plan to use disaster relief funding to log the Rim Fire area and build the biomass power plant as "an integrated replicable model for community and watershed resilience," the agencies blatantly disregarded requirements under NEPA and HUD regulations to aggregate and assess the impacts of the two actions in a single EIS, or at the very least, supplement the adopted EISs for the logging project with an analysis of the cumulative impacts of the biomass power plant. 40 C.F.R. § 1508.25(a)(1) (2019); 24 C.F.R. § 58.32(c) (2019). Use of disaster relief funds for the logging project and the biomass powerplant, by California's own design, are really "a single course of action," and because their effects are cumulative and the projects are connected, they must be analyzed together.

**C.    The Logging Activities are an Impermissible Use of Disaster Relief Funding**

Following Hurricane Sandy, Congress passed the Disaster Relief Appropriations Act of 2013 (P.L.113–2, 127 Stat. 4) ("Disaster Relief Act"), which made substantial federal funding

available for expenses relating to disaster relief, long-term recovery, restoration of infrastructure and housing, and economic revitalization in the most impacted and distressed areas recovering from major disasters. HUD received a portion of these funds to disperse through its Community Development Fund, via Community Development Block Grants ("CDBG"). The Disaster Relief Act limits the types of activities that are eligible for CDBG funding to those that are authorized by the Housing and Community Development Act of 1974 (42 U.S.C. § 5301 et. seq.). *See* Disaster Relief Act, P.L.113–2, 127 Stat. 15. Those activities include, for example, housing restoration and development, land acquisition and local government planning assistance but do not include general government expenses or operating and maintenance expenses. 42 U.S.C. § 5305 (2018) (setting out list of eligible activities).

HUD established the National Disaster Resilience Competition ("NDRC") as a grant funding opportunity for states and communities recovering from disaster to apply for the Disaster Relief Act CDBG funding. HUD awarded California $70 million in total of Disaster Relief Act NDRC funds. Darzen Decl. Ex. 3. Of that, $28 million is allocated for the FWHP logging project, as one of the three pillars of California's integrated "Community and Watershed Health Resilience Program." HUD's award and subsequent release of those funds to California, which the state then passed directly to the Forest Service to log the Stanislaus National Forest, was an invalid authorization of funding, as the logging activities that are being funded with the NDRC funding are not eligible. 42 U.S.C. § 5305 (2018). HUD and the State of California have failed to justify how logging newly, naturally growing conifers, only to then replant them again, falls under any of the categories of eligible disaster relief activities "in the most impacted and distressed areas" following the Rim Fire, particularly in light of the new data collected by plaintiffs and the 2019 North et. al. study stating that reforestation is unnecessary where the forest is already in the early stages of regeneration. The logging that is occurring is not assisting recovery, nor is it creating resilience, nor is it providing any relief to those most impacted by the Rim Fire. It is simply not an eligible disaster relief activity and HUD's award of the funds was arbitrary and capricious and not in accordance with law.

No.:  3:19-cv-05792-LB - MEMORANDUM IN SUPPORT OF
MOTION FOR TRO AND PRELIMINARY INJUNCTION -  18

Crag Law Center
*3141 E Burnside Street*
*Portland, Oregon 97214*
*Tel. 503-525-2725*

1    For any of these independent reasons, Plaintiffs are likely to succeed on the merits.

2    **III.    Plaintiffs Will Suffer Irreparable Harm Absent an Injunction**

3    An injury is "irreparable" where it cannot be adequately remedied by money damages or

4    other legal remedies, and where such injury is "permanent or at least of long duration." *Amoco*

5    *Prod. Co. v. Village of Gambell*, 480 U.S. 531, 545 (1987). Harm is likely if it is not speculative

6    or remote. *Alliance for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1135 (9th Cir. 2011)*

7    (logging that would harm "ability to 'view, experience, and utilize'" project area constitutes

8    irreparable injury, even if some portion of the forest will remain after the logging).

9    Two of the goals of this project are to restore mixed conifer forest to the landscape and

10   restore old forest for wildlife habitat and connectivity. Chi Decl. ¶¶ 17 But based on surveys

11   performed by three experts: "these forests have already begun early stage establishment of mixed

12   conifer forest…and currently provide habitat to an abundance of "wildlife species." Chi Decl. ¶

13   19.  Through the passage of time, nature has regenerated the forest and so artificial methods of

14   reforestation are not required. Chi Decl. ¶¶ 18, 23 The implementation is harming naturally

15   recovering young forests and habitat for a variety of wildlife. Chi Decl. ¶¶ 20-21. Plaintiffs have

16   documented the presence of "Black-backed woodpecker, Hairy woodpecker, White-headed

17   woodpecker, Downy woodpecker, Williamson's sapsucker, Pileated woodpecker, Northern

18   flicker, Mountain Bluebird…" and over a dozen more cavity-nesting birds, owls and raptors in

19   the project area. Chi Decl. ¶ 20 & Ex. 1 thereto; Kholsa Decl. ¶¶ 5, 7-9 & Ex. 1 thereto; Jennings

20   Decl. Ex. 1 thereto.

21   The implementation of the project is irreparably harming the interests of Plaintiffs'

22   members, by impacting thousands of acres of forest that plaintiffs enjoy. Moas Decl. ¶¶ 6-12,

23   Brindis Decl. ¶¶ 4-7, Marderosian Decl. ¶¶ 6-10. Plaintiffs seek out and spend time in naturally

24   recovering young forests that emerge after fire because of the abundant wildlife these forests

25   contain -- and the forests in and surrounding project areas are chocked full of wildlife. Jennings

26   Decl. ¶¶ 4-13; Kholsa Decl. ¶¶ 7-9 & Ex. 1 thereto, Chi Decl. ¶¶ 14-22 & Exh. 1 thereto.

27   Plaintiffs' members enjoy the scenic beauty, the ability to view wildlife, spiritual rejuvenation,

28

No.:  3:19-cv-05792-LB - MEMORANDUM IN SUPPORT OF
MOTION FOR TRO AND PRELIMINARY INJUNCTION -  19

Crag Law Center
*3141 E Burnside Street*
*Portland, Oregon 97214*
*Tel. 503-525-2725*

recreation, and scientific research opportunities. Moas Decl. ¶¶ 6-12; Brindis Decl. ¶¶ 4-7; Marderosian Decl. ¶¶ 6-10, Hanson Decl. ¶¶ 8-10.

Clearcutting the new young forests, including the snag forest habitat, using heavy equipment and then applying herbicides to the area harms the Plaintiffs' interest and the wildlife that currently inhabit this burned forest ecosystem. Chi Decl. ¶¶ 23-24. The harms are realized as soon the trees are cut, the soil compacted and the pesticides applied. *Id.*; Hanson Decl. ¶¶ 11-14. These are exactly the type of harms the Ninth Circuit has found to be irreparable. *See, e.g., Cottrell*, 632 F.3d at 1127; *Earth Island Inst. v. United States Forest Serv.*, 442 F.3d 1147, 1169-73 (9th Cir. 2006) (logging of several thousand acres of post-fire California spotted owl habitat constitutes irreparable harm). These harms cannot be remedied by money damages, and once the trees are felled, among other aspects of these "treatments," they will not be replaced on the landscape by comparable habitat in the lifetime of Plaintiffs' members. Declaration of Pushker Karecha ("Karecha Decl.") ¶¶ 5-8.  Logging these young forests and the snag habitat where wildlife is thriving is irreparable. Chi. Decl. ¶¶ 23-24; Hanson Decl. ¶¶ 12-13, Ex. 2.

## IV.    The Balance of Equities and Public Interest Tip Sharply in Plaintiffs' Favor

Logging naturally recovering young forests and snag forest habitat will harm California spotted owls, Northern Goshawk, Great Grey Owls, Black-backed woodpeckers and other animals that currently enjoy these burned areas. Chi Decl. ¶¶ 14-24 & Ex. 1 thereto; Jennings Decl. ¶¶ 3-13 & Ex. 1 thereto; Kholsa Decl. ¶¶ 7-9 & Ex.1 thereto. Plaintiffs' experts extensively surveyed the proposed logging units and found extensive conifer regeneration.  Kholsa Decl. ¶¶ 7-9; Chi Decl. ¶¶ 15-18.

"[I]f environmental injury is sufficiently likely, the balance of harms will usually favor the issuance of an injunction to protect the environment." *Sierra Club v. Bosworth*, 510 F.3d 1016, 1033 (9th Cir. 2007)(*quoting Amoco Prod. Co.*, 480 U.S. 531, 545 (1987)); *Earth Island Inst. v. U.S. Forest Service*, 351 F.3d 1291, 1299 (9th Cir. 2003). Here, logging is currently underway and scheduled to continue as long as conditions allow.  Plaintiffs' interests in enjoying the young emerging forests and the wildlife that thrive in burned forests are being harmed by logging. Brindis Decl. ¶¶ 3-7; Moas Decl. ¶¶ 4, 6, 9, 11-12; Marderosian Decl. ¶ 3, 6, 7-10;

Crag Law Center
*3141 E Burnside Street
Portland, Oregon 97214
Tel. 503-525-2725*

1  Hanson Decl. ¶¶ 7-14;  The burned trees that are providing habitat for wildlife are being cut

2  down and the soils are being impacted by ground-based logging equipment.  Hanson Decl. ¶¶ 7-

3  14; Chi Decl. ¶¶ 22-24.   The fire burned this area nearly 6 years ago, and since that time there

4  has been extensive conifer regeneration. Chi Decl. ¶¶ 5-7, 14-24; Kholsa Decl. ¶¶ 7-9; Hanson

5  Decl. ¶12-15, Exs. 2 & 3. Experts and professional photographers have documented the diversity

6  of wildlife that is thriving in the proposed logging units. Jennings Decl., Ex 1; Kolsa Decl.

7  Exhibit 1; Chi Decl. Exhibit 1; Hanson Decl. Ex. 1.

8       The Forest Service has received pass-through funding from HUD so there is no "loss of

9  revenues" to the government to consider, and, even if there were, a "loss of anticipated revenues

10 … does not outweigh the potential irreparable damage to the environment." *Earth Island II*, 442

11 F.3d at 1177.  Indeed, no rational argument can be advanced that a preliminary injunction would

12 prejudice defendants on account of deterioration of the value of the burned trees since the project

13 involves the on-site burning or off-site incineration of these trees.  Therefore, any further

14 deterioration of the trees is inconsequential.  Further, as discussed by the Ninth Circuit, any

15 economic loss during the pendency of an injunction does not represent a complete and total loss,

16 akin to the loss of habitat, but rather a delay and potentially a reduction in revenue. *League of*

17 *Wilderness Defenders/Blue Mts. Biodiversity Project v. Connaughton,* 752 F.3d 755, 764-68 *(9th*

18 *Cir. 2014)*. Here, as in League of Wilderness Defenders/Blue Mountains Biodiversity Project,

19 the likely irreparable injury to young recovering forests and the wildlife habitat provided by the

20 standing burned trees, and to Plaintiffs' use and enjoyment of that habitat, outweighs the

21 economic interests of the Forest Service and private logging companies. *Id.*

22      For the foregoing reasons, the balance of harms and the public interest strongly favor an

23 injunction against further logging.

24 **V.    The Bond Requirement Should be Waived**

25      It is well established in the Ninth Circuit that, pursuant to Fed. Rule of Civ. Pro. 65(c),

26 Federal courts have discretion as to the amount of security to require for issuance of a

27 preliminary injunction and may even dispense with the security requirement altogether. *See*

28 *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009) ("'Rule 65(c) invests the district court

No.:  3:19-cv-05792-LB - MEMORANDUM IN SUPPORT OF
MOTION FOR TRO AND PRELIMINARY INJUNCTION - 21

Crag Law Center
*3141 E Burnside Street*
*Portland, Oregon 97214*
*Tel. 503-525-2725*

1   with discretion as to the amount of security required, if any.'" (*quoting Jorgensen v. Cassiday*,

2   320 F.3d 906, 919 (9th Cir. 2003)

3       In addition, the Ninth Circuit recognizes a public interest exception to the imposition of a

4   substantial bond in order to ensure that the mechanisms established by Congress for private

5   enforcement are not frustrated. *Cal. ex rel. Van De Kamp v. Tahoe Reg'l Planning Agency*, 766

6   F.2d 1319, 1325-26 (9th Cir. 1985); *Friends of the Earth v. Brinegar*, 518 F.2d 322, 323 (9th

7   Cir. 1975). In the present case, Plaintiffs seek to enforce the National Environmental Policy Act

8   through the Administrative Procedure Act ("APA"). The APA specifically contemplates actions

9   by citizens. As explained by the Supreme Court construing analogous citizen suit provisions,

10  Congress, in enacting such provisions, "has opted to rely heavily on private enforcement to

11  implement public policy and to allow counsel fees so as to encourage private litigation." *Alyeska

12  Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 163 (1975). A bond order that exposes

13  citizen plaintiffs to substantial financial liability effectively cancels out the incentive to enforce

14  law created by Congress. "The same individuals whom Congress encourages to sue by

15  permitting the recovery of attorneys' fees should not be discouraged from seeking interlocutory

16  relief by the risk of a tremendous liability." *Note, Recovery for Wrongful Interlocutory

17  Injunctions Under Rule 65(c)*, 99 Harv. L. Rev. 828, 835 n.29 (1986)

18

19     . In addition, "Congress has indicated that private environmental organizations should

20  assist in enforcing NEPA. Section 101(a) of NEPA states:

21      Congress . . . declares that it is the continuing policy of the Federal Government

22      in cooperation with . . . concerned public and private [**3] organizations, to use

23      all practicable means and measures . . . to create and maintain conditions under

24      which man and nature can exist in productive harmony . . . . 42 U.S.C. §4331(a)

25      (1970).

26  *Natural Resources Defense Council, Inc. v. Morton*, 337 F.Supp. 167, 168 (D.D.C. 1971).

27      Where the imposition of a substantial bond to protect a party against losses conflicts with

28  statutory intent of encouraging private citizen actions to protect the public interest, as exist in the

APA and NEPA, it is incumbent on the district court to ensure that the imposition of a "bond will not defeat the Plaintiff's right to injunctive relief." *Division 1, Detroit Brotherhood of Locomotive Engineers v. CONRAIL*, 844 F.2d 1218, 1227 (6th Cir. 1998). "Congress made clear that citizen groups are not to be treated as nuisances or troublemakers, but rather as welcomed participants in the vindication of environmental interests." *Friends of the Earth v. Carey*, 535 F.2d 172 (2nd Cir. 1976). Indeed, "[s]pecial precautions to ensure access to the courts must be taken where Congress has provided for private enforcement of a statute." *California ex rel. Van De Kamp*, 766 F.2d at 1325-26.

In fact, the only situations wherein a substantial bond has been deemed appropriate in an environmental enforcement action is when the Plaintiff fails to submit any evidence that they either cannot afford to post a substantial bond (*Save Our Sonoran, Inc. v. Flowers*, 408 F.3d 1113 (9th Cir. 2005)) or that the posting of a substantial bond would create an undue hardship. *Habitat Educ. Ctr. v. U.S. Forest Service*, 607 F.3d 453, 458 (7th Cir. 2010) (Plaintiff Habitat Education Center never submitted evidence that a substantial bond would be a hardship, and actually admitted that posting the $10,000 bond had caused it no hardship.)

As the declarations submitted herewith demonstrate, the ability of the non-profit Plaintiffs in this case to go to court to enforce environmental laws would be profoundly and adversely affected by the imposition of anything more than a nominal bond because they have budgets dependent upon the timelines of the grants they have received and because their funds are restricted in their use, and any discretionary funds are necessary for standard operating expenses. *See generally* Hanson Dec. ¶ 26, Marderosian Decl. ¶ 11; Moas Decl. ¶ 13-15. Requiring a bond would not only preclude Plaintiffs from obtaining the injunctive relief in the present action but would also curtail their ability to enforce environmental laws in the future. *Id*

## CONCLUSION

To protect plaintiffs from irreparable harm of loss of young forests and habitats, plaintiffs ask the Court to preliminarily enjoin the use of HUD Disaster Relief Act funding for any activities on the Stanislaus National Forest, including imminent logging, vegetation removal, herbicide spraying and burning.

No.:  3:19-cv-05792-LB - MEMORANDUM IN SUPPORT OF
MOTION FOR TRO AND PRELIMINARY INJUNCTION -  23

Crag Law Center
*3141 E Burnside Street
Portland, Oregon 97214
Tel. 503-525-2725*

Respectfully submitted this 24th day of September, 2019.

*/s/ Meriel Darzen*
Meriel Darzen, *Pro Hac Vice*
Ralph Bloemers, *Pro Hac Vice*
Crag Law Center

*Attorneys for Plaintiffs*

No.:  3:19-cv-05792-LB - MEMORANDUM IN SUPPORT OF
MOTION FOR TRO AND PRELIMINARY INJUNCTION -  24

Crag Law Center
*3141 E Burnside Street*
*Portland, Oregon 97214*
*Tel. 503-525-2725*